**YKK CORPORATION and YKK (U.S.A.), Inc., Plaintiffs,**

v.

**JUNGWOO ZIPPER CO., LTD., and YPP (U.S.A.), Inc., Defendants.**

**No. CV00–05731FMC(RCx).**

United States District Court, C.D. California.

Aug. 8, 2002.

Donald L. Ridge, Morris, Polich & Purdy, Los Angeles, CA, Douglas A. Rettew, Mark S. Sommers, Robert D. Litowitz, Louis J. Levy, Anessa J. Owen, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, DC, for plaintiffs.

Robert F. Scoular, Mark T. Hansen, Felix T. Woo, Sonnenschein, Nath & Rosenthal, Los Angeles, CA, Randy M. McElvain, Julie A. Mote, Weston & McElvain, Los Angeles, CA, for defendants.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

COOPER, District Judge.

This matter is before the Court on Plaintiff YKK's Motion for summary judgment. The Court has considered the arguments raised in the parties' briefs and at oral argument, held on February 19, 2002.[1]

For the reasons set forth below, the Court hereby **GRANTS** in part and **DENIES** in part the Motion.

### I. Background

Founded in 1934 in Japan, YKK is the world's leading manufacturer and supplier of zippers and fasteners. YKK has 121 companies operating in 59 countries around the world, including the United States. YKK manufacturers zippers in Georgia, and has five divisional headquarters and twenty sales and distribution centers throughout the U.S. The YKK name and trademark are derived from YKK's original company name, "Yoshida Kogyo Kabushikikaisha." YKK has obtained a large number of trademark registrations in the United States for zippers, fasteners, and related products, including different stylized representations of the initials "YKK." Some of these registered trademarks have achieved incontestable status.

YKK first started using the YKK mark in the United States in approximately 1949, and has continually used the mark here ever since in connection with its sales of zippers, fasteners, and related products. It sells its goods to such companies as Levi Strauss, Sears, and The Gap. YKK has extensively promoted its YKK branded products over the last forty years, and brand recognition remains an important priority for YKK. YKK has been quite successful, selling over $220 million worth of products in the U.S. and $1.4 billion worldwide in 1999.

Defendant Jungwoo Zipper Company ("Jungwoo") is a Korean company that distributes zippers in the United States. Defendant YPP is a California company that is a branch or division of Jungwoo that markets and distributes Jungwoo's products in the United States.

On May 26, 2000, Plaintiff filed a complaint against the Defendants for federal, state, and common law trademark and trade name infringement, trademark dilution, unfair competition, and copyright infringement.

### II. Standard

Summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file,

---

1. The Court has also received and considered the Supplemental Declaration of Sandra Cogan, filed on March 1, 2002.

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. Rule Civ. Pro. 56(c); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Whether a fact is material is determined by looking to the governing substantive law; if the fact may affect the outcome, it is material. *Id.* at 248, 106 S.Ct. 2505.

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude the use of summary judgment. *Harper v. Wallingford,* 877 F.2d 728 (9th Cir.1989).

The Court construes all evidence and reasonable inferences drawn therefrom in favor of the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Brookside Assocs. v. Rifkin,* 49 F.3d 490, 492–93 (9th Cir.1995).

### III. Discussion

*A. Trademark infringement and unfair competition claims*

*Background principles and considerations*

Section 32(1) of the Lanham Act makes unlawful the use of a "reproduction, counterfeit, copy or colorable imitation" of a registered mark in such a way as "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). In addi-

tion, Section 43(a) of the Act prohibits the use of a mark that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a). The tests are the same for unfair competition under section 43(a) and trademark infringement under section 32(1). *See Grey v. Campbell Soup Co.*, 650 F.Supp. 1166, 1173 (C.D.Cal.1986), *aff'd* 830 F.2d 197 (9th Cir.1987). Plaintiff's state law claims for trademark infringement and unfair competition claims under Cal. Bus. & Prof.Code § 17200 et seq. and the common law are also guided by the same analysis. *See id.; see also Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir.1994)("This Circuit has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act"); *see also* J. Thomas McCarthy, 3 McCarthy on Trademarks and Unfair Competition § 23.1 (4th ed. 2000) ("Many courts, in analyzing a claim of infringement based on both federal and state law, will apply to both a single analysis of the likelihood of confusion issue.")

"The core element of trademark infringement is the likelihood of confusion, *i.e.,* whether the similarity of the marks is likely to confuse customers about the source of the products." *E. & J. Gallo Winery v. Gallo Cattle Company,* 967 F.2d 1280, 1290 (9th Cir.1992). The Court's concern for confusion among "consumers" as opposed to the general public is grounded in the very purpose of trademark law.

[T]rademark law, by preventing others from copying a source-identifying mark, "reduce[s] the customer's costs of shopping and making purchasing decisions,"

for it quickly and easily assures a potential customer that this item—the item with this mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past. At the same time, the law helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product.

*Qualitex Co. v. Jacobson Products Co. Inc.*, 514 U.S. 159, 163–64, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (citation omitted). A "likelihood" of confusion requires the Court to find that confusion is "'probable, not simply a possibility.'" *Murray v. Cable Natl. Broadcasting Co.*, 86 F.3d 858, 861 (9th Cir.1996) (quoting *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir.1987)). Thus, the law requires "a showing that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care." *International Association of Machinists and Aerospace Workers, AFL–CIO v. Winship Green Nursing Center*, 103 F.3d 196, 201 (1st Cir.1996)

In this case, the central question is whether a reasonable consumer wishing to purchase zippers, fasteners or related products might confuse YKK's goods with YPP's. *See Murray*, 86 F.3d at 861 ("A likelihood of confusion exists when a consumer viewing a service mark is likely to purchase the services under a mistaken belief that the services are, or are associated with, the services of another provider."); *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998) (the question is "whether a reasonable consumer attending a Dreamwerks-sponsored convention might do so believing that it is a convention sponsored by DreamWorks."). YKK sells its goods to the following categories of consumers: (1) name-brand and private-label clothing manufacturers (e.g. Levi Strauss and The Gap); (2) the makers of other products ranging from wetsuits to sleeping bags; (3) "assemblers" who buy and assemble zipper components; and (4) "jobbers" who act as distributers.

Besides "source confusion" of actual and potential customers, "post-sale confusion" may also be relevant. "Post-sale confusion occurs when consumers view a product outside the context in which it is originally distributed and confuse it with another, similar product." *Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1455 (9th Cir.1991). For example, in *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817 (9th Cir.1980) the court enjoined a defendant's use of a small red tab protruding from the back pocket of its Wrangler blue jeans as infringing Levi's red pocket tab trademark. Although it appeared that confusion at the point of sale was unlikely, the potential for post-sale confusion still existed because prospective jeans purchasers who carried even an imperfect recollection of Levi's pocket tab trademark might confuse the defendant's jeans with Levi's and this might influence their future purchase decisions. *See id.* at 822. Finally, confusion as to affiliation, connection, or sponsorship is also actionable. For example, a zipper products consumer might be confused by the similarity of YKK and YPP and mistakenly believe that YPP is somehow affiliated with or sponsored by YKK.

The Ninth Circuit uses a multi-factor test for assessing likelihood of consumer confusion in trademark infringement actions; those factors include: (1) strength of mark, (2) proximity of goods, (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark;

and (8) likelihood of the expansion of product lines. *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir.1979). *see also Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1391 (9th Cir.1993); *Gallo*, 967 F.2d at 1290.

"This list of factors, while perhaps exhausting, is neither exhaustive nor exclusive. Rather, the factors are intended to guide the court in assessing the basic question of likelihood of confusion. The presence or absence of a particular factor does not necessarily drive the determination of a likelihood of confusion." *E. & J. Gallo Winery*, 967 F.2d at 1290–1291. Moreover, as explained by the Ninth Circuit:

> this eight-factor test for likelihood of confusion is pliant. Some factors are much more important than others, and the relative importance of each individual factor will be case-specific. Although some factors—such as the similarity of the marks and whether the two companies are direct competitors—will always be important, it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors.

*Brookfield Communications, Inc. v. West Coast Entertainment Corporation*, 174 F.3d 1036, 1054 (9th Cir.1999).

"[L]ikelihood of confusion is a mixed question of law and fact that is predominantly factual in nature." *E. & J. Gallo Winery*, 967 F.2d at 1290; *see also Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1356 (9th Cir.1985) ("Whether confusion is likely is a factual determination woven into law").

With these considerations in mind, we turn to the application of the eight factors to the instant case.

*Application of the Sleekcraft factors to the instant case*

*(1) strength of mark*

■ "A strong mark is inherently distinctive, for example, an arbitrary or fanciful mark; it will be afforded the widest ambit of protection from infringing uses." *Sleekcraft*, 599 F.2d at 349. "[A] mark with extensive public recognition and renown deserves and receives more legal protection than an obscure or weak mark." *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 353 (Fed.Cir.1992)

The YKK trademark is extremely strong—it is comprised of an arbitrary arrangement of letters that serves no purpose other than to identify YKK and the source of its products. YKK is derived from "Yoshida Kogyo Kabushikikaisha," the original company name, and is in no way either descriptive or suggestive of the company's products. Besides being an inherently strong trademark, YKK has achieved worldwide brand name recognition as a result of its manufacturing, distribution, marketing, advertising, and sales efforts over the last half century. Even YPP admits that YKK "dominates the zipper market" and "has been the leading zipper manufacturer for over 50 years and has become the world's largest supplier of zippers." (Opp. at 14).

YPP contends that YKK's tremendous brand recognition and financial success help enable customers to readily distinguish it from other competing brands. But YPP offers no case law or authorities indicating that the strength-of-mark analysis is concerned with this type of consideration. As pointed out by Plaintiff in its Reply brief, the case law and authorities addressing the subject contradict, rather than support, Defendants' contention. (Reply at 15). In *James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266 (7th Cir.1976) the Seventh Circuit explained:

What is intended by references to "strong" and "weak" marks is the effect of such marks upon the mind of the consuming public. A mark that is strong because of its fame or uniqueness, is more likely to be remembered and more likely to be associated in the public mind with a greater breadth of products and services than is a mark that is weak because relatively unknown or very like similar marks or very like the name of the product.

*Id.* at 276; *see also Kenner Parker Toys,* 963 F.2d at 353; Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 11:73 (4th ed.2001).

YKK is an arbitrary mark, and a number of YKK trademarks have even achieved incontestable status. It is also famous throughout the world and can claim very high consumer recognition. The strength of the YKK mark is beyond question, and should "be afforded the widest ambit of protection from infringing uses." *Sleekcraft,* 599 F.2d at 349.

The Court finds that this factor weighs strongly in favor of a finding of likelihood of confusion.

### (2) proximity of goods

■ "Related goods are more likely than non-related goods to confuse the public as to the producers of goods." *Official Airline Guides, Inc.,* 6 F.3d at 1392. "Related goods are those 'products which would be reasonably thought by the buying public to come from the same source if sold under the same mark.'" *Sleekcraft,* 599 F.2d at 348 n. 10 (quoting *Standard Brands, Inc. v. Smidler,* 151 F.2d 34, 37 (2d Cir.1945)). Moreover, when goods are complementary, sold to the same class of purchasers; or similar in use and function, less similarity between the marks need be demonstrated when analyzing this factor. *See Sleekcraft,* 599 F.2d at 350.

The parties' goods are direct competitors, and therefore their goods are about as proximate as they could possibly be. *See Hillerich & Bradsby Co. v. Palm Springs Golf Company,* 215 U.S.P.Q. 680, 683, 1982 WL 52141 (C.D.Cal.1982) (finding that plaintiff's POWER BILT golf clubs and defendant's POWER BOLT golf clubs are proximate goods).

The Court finds that this factor weighs strongly in favor of a finding of likelihood of confusion.

### (3) similarity of the marks

■ Similarity of the marks is "a critical question in the likelihood of confusion analysis." *GoTo.Com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1205 (9th Cir.2000). The greater the similarity between the two marks, the greater the likelihood of confusion. *See id.* at 1206. Similarity is determined by the appearance, sound and meaning of the marks when considered in their entirety and as they appear in the marketplace. *See GoTo.Com,* 202 F.3d at 1206; *Dreamwerks,* 142 F.3d at 1131; *Sleekcraft,* 599 F.2d at 351. The similarities of the marks are weighed more heavily than differences. *See GoTo.Com,* 202 F.3d at 1206; *Brookfield,* 174 F.3d at 1054. In addition, "[a] diminished standard of similarity is ... applied when comparing the marks of closely related goods." *Official Airline Guides, Inc.,* 6 F.3d at 1392.

### Appearance:

Defendants maintain that the letter "Y" is "generic" in the zipper industry because it is descriptive of the appearance of an open zipper. In support, YPP points to a number of other zipper companies that feature the letter "Y" in their logos. As a result of "Y"'s alleged generic status, YPP contends that the two companies' shared use of the letter "Y" at the beginning of their marks is irrelevant. In so arguing,

YPP appears to ignore the anti-dissection rule of trademark comparison. McCarthy describes this rule as: "Conflicting composite marks are to be compared by looking at them as a whole, rather than breaking the marks up into their component parts for comparison... The rationale for the rule is that the commercial impression of a composite trademark on an ordinary prospective buyer is created by the mark as a whole, not by its component parts." 3 McCarthy on Trademarks and Unfair Competition § 23:41 (4th ed.2001).

In addition, Defendants point out that "PP" looks different from "KK" and that the YPP advertising logo is quite different from the YKK one. The YPP advertising logo depicts "Y" in light blue and "PP" in a darker blue. Additionally, the letters are straight with a line going through them to signify a zipper. The YKK advertising logo until recently featured "YKK" in bubble letters with all three letters bearing the same color. YKK has recently changed its bubble logo to a solid logo, but YPP claims that this was done after the filing of this lawsuit in an attempt to make YPP look worse.

YKK claims that the marks are far more similar in appearance than Defendants would like to admit. First, they are both three letters, beginning with "Y" and followed by a single hard consonant repeated twice. Moreover, Plaintiff claims that the YPP mark appears on its zippers in a similar fashion to the way in which YKK appears on its zippers. YKK also correctly points out that under Ninth Circuit case law, "similarities in these characteristics [of sight, sound, and meaning] 'weigh more heavily than differences.'" *E. & J. Gallo,* 967 F.2d at 1291 (quoting *Sleekcraft,* 599 F.2d at 351).

*Sound:*

Defendants claim that YPP and YKK are pronounced differently and sound different. Plaintiff YKK, however, contends that the cadence is the same and that the "Y" plus two hard consonants structure makes the two marks sound similar.

*Meaning:*

YPP claims that its three letters stand for "Your Premium Product," a slogan that accompanies the YPP logo in many of the company's advertisements. By contrast, YKK is simply the initials of the founder of YKK, Yoshida Kogyo Kabushiki.

The marks are very similar and their differences relatively minor. "Obviously, the greater the similarity between the two marks at issue, the greater the likelihood of confusion." *GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d. at 1206. In the most obvious context in which the mark would appear—the zipper tab attached to each product—a reasonable juror would have to find the marks similar. Accordingly, the Court finds this factor to favor the plaintiff.

*(4) evidence of actual confusion*

■ Evidence of actual confusion is "persuasive proof that future confusion is likely." *Kendall–Jackson Winery, Ltd. v. E. & J. Gallo Winery,* 150 F.3d 1042, 1048 (9th Cir.1998) (citation omitted). But although "[e]vidence of actual confusion is relevant to the issue of likelihood of confusion ... the absence of such evidence need not create an inference that there is no likelihood of confusion." *E. & J. Gallo,* 967 F.2d at 1292.

YKK alleges that actual confusion can be presumed based upon the similarity of the trademarks and the fact that the YKK and YPP are competitors both selling zippers. YKK also claims that three of its customers, and even its advertising agency, contacted YKK to express their concern that YPP's trademark would confuse customers.

Defendants contend that there is no actual confusion occurring between YPP and YKK products. Defendants assert that the mere concern of possible confusion by some of YKK's customers is not evidence of actual confusion. Moreover, they point to YKK's inability to demonstrate instances of actual confusion as indicative of there being none.

Defendants also provide the analysis and testimony of two alleged experts in support of their claim that there is no actual confusion occurring. "While survey evidence is sometimes said to be evidence of 'actual' confusion, it is so only to the extent that the survey replicates the real world setting which can create an instance of actual confusion. In any event, the two types of evidence are significantly different in *kind* and are treated separately here." Thomas J. McCarthy, McCarthy on Trademarks and Unfair Competition § 23:17 (4th ed.2001). Nonetheless, survey evidence may be probative to the central inquiry in trademark infringement cases: whether there is a likelihood of customer confusion.

In support of their contention that there is no actual confusion, Defendants offer the expert opinion of Weston Anson. Defendants claim that Anson has extensive experience in the trademark licensing field and has viewed the documents and information gathered in the case and read the relevant Ninth Circuit authority. Based upon his application of the *Sleekcraft* factors, Anson concludes that there is no likelihood of confusion between the two trademarks. Anson's report is completely unhelpful; in fact, it bears a truly amazing resemblance to Defendants' Opposition. In particular, the Anson report's *Sleekcraft* analysis is substantively identical to the Opposition. The report provides absolutely nothing in the way of new factual or industry-specific background or analysis. Furthermore, although the Defendants as-

sert that Anson is an expert, it does not appear that he is a licensed attorney. Therefore, it is hard to see how his *Sleekcraft* analysis can constitute expert opinion, as it requires him not only to make factual determinations, but also to draw legal conclusions. Expert testimony is required to be within the scope of the proffered expert's expertise. By opining on the likelihood of confusion based on the *Sleekcraft* factors, the Anson Report draws a legal conclusion. While Fed. R.Evid. Rule 704 abolished the so-called "ultimate issue" rule, "[i]n general, testimony about a legal conclusion, or the legal implications of evidence is inadmissable under Rule 704." 4 Weinstein's Federal Evidence § 704.04[1] at (Matthew Bender ed.2001); *see also United States v. Weitzenhoff,* 1 F.3d 1523, 1531 (9th Cir.1993), *modified on other grounds,* 35 F.3d 1275 (9th Cir.1994); Adivsory Committee Note to Rule 704. The expert's legal conclusions are unhelpful because they "suppl[y] the jury with no information other than the witness's view of how the verdict should read." 4 Weinstein's Federal Evidence § 704.4[2][a] at 704–12. Although there are some exceptions to this rule that an expert's legal conclusions are inadmissible, Defendants have not raised any that might apply to Anson's Report; nor does the Court find that any could. Therefore, the Court will not consider Anson's legal conclusions, although his opinions on the individual foundational facts, i.e. the individual *Sleekcraft* factors are admissible and will be considered.

Defendants also offer a customer survey conducted by Dr. Sandra Cogan as evidence of there being no likelihood of consumer confusion. Dr. Cogan interviewed a number of companies that purchase zippers for clothing and asked them questions relating to the YKK and YPP marks. This survey allegedly demonstrates that the relevant consumers are not confused

by any similarity between the YKK and YPP marks. According to Cogan, only 2.74% of survey respondents thought that YPP brand zippers were made by or connected with YKK brand zippers, and none of the respondents made this connection based on "name reasons."[2]

Although Cogan concludes that there is no likelihood of confusion between the YPP and YKK marks, the survey data itself actually suggests that there is a substantial potential for confusion. Cogan's Report inexplicably ignores a whole category of survey respondents who were unsure whether the two marks were affiliated and therefore appear to be prime candidates for actual confusion in the future. The survey respondents were faxed five one-page printouts from the Internet websites of zipper companies having the following letters in their names: YKK, YPP, YCC, YJX, and LYC. They were then asked whether they thought any of the four non-YKK brands were made by or otherwise affiliated with YKK. Those who answered "yes" were asked which brands they thought were connected to YKK.[3] Co-

gan's subsequent confusion analysis only focuses on this subgroup of "yes" respondents. But the 34.25% of respondents who answered that they "did not know", "had no opinion", or were "not sure" if any of the four non-YKK brands were connected to YKK were not asked any follow-up questions and were thereafter discarded from the survey. This group of respondents looks to be the very definition of potential confusion; they did not know or were unsure whether there was any connection between YKK and the other four brands, including YPP. Some of them may have answered "Don't know/no opinion/not sure" for reasons other than confusion, but we will never know because Cogan did not ask this group any follow-up questions. Although the 34.25% of respondents who answered "not sure," "no opinion," or "don't know" are not evidence of *actual* confusion,[4] they are evidence of potential, perhaps even likely, confusion in the future.

The Court finds that this factor favors plaintiff. Although the Court has been presented with little, if any, evidence of

---

**2.** Plaintiff claims that the Cogan survey is so replete with errors that it lacks any scientific or evidentiary value and is therefore inadmissible under Fed.R.Evid. Rule 702. Plaintiff maintains that the Cogan survey has not been conducted in accordance with accepted principles and "pervasive and fundamental errors—far exceeding mere technical deficiencies—permeate every aspect of the Cogan survey." (Reply at 20). In support of its contention that the Cogan survey is defective and was not conducted in accordance with accepted principles, YKK provides the Court with the Report of Dr. Stewart. According to Stewart, the Cogan survey violates all seven pillars of survey reliability set forth in the Federal Judicial Center's Manual for Complex Litigation § 21.493 (3d. ed.1995). As a result, Dr. Stewart concludes that no expert in the field of consumer research could reasonably base any opinion or draw any inference from the survey.

Generally, deficiencies in a survey go to the weight (and not the admissibility) of survey

evidence. *See e.g. E. & J. Gallo*, 967 F.2d at 1292. On the other hand, surveys are only admissible "as long as they are conducted according to accepted principles." *Id.* After reading Dr. Stewart's Report and Dr. Cogan's Supplemental Declaration (Exhibit C), the Court finds that Dr. Cogan's Report is admissible and its deficiencies go to its weight.

**3.** Nine respondents (12.33% of the 73 total respondents) thought that at least one of the four non-YKK brands was affiliated or made by YKK. Of those, five respondents (6.85% of total) thought that YPP was made by YKK.

**4.** "Actual confusion" consists of consumers who mistakenly thought that the products of one company, e.g. YPP, were affiliated with another company, e.g. YKK. The 34.25% "uncertain" group did not make an actual mistake regarding affiliation, they merely professed their uncertainty.

actual, real-world confusion, Cogan's survey suggests that there is serious potential for consumer confusion in the future, as over one-third of survey respondents either "had no opinion," "were not sure," or "did not know" if YPP was affiliated with YKK. This factor weighs slightly in favor of a finding of a likelihood of confusion.

### (5) marketing channels used

■ The parties are direct competitors and utilize the same marketing channels. Although the parties may not have the same distributor clients, they compete for the same clients using similar advertising and promotional efforts. They also both attend and sponsor booths at the same trade shows (the Bobbin show) and they both send out product catalogs.

The Court finds that this factor strongly weighs in favor of Plaintiff.

### (6) type of goods and the degree of care likely to be exercised by the purchaser

"Likelihood of confusion is determined on the basis of a 'reasonably prudent consumer.' ... What is expected of this reasonably prudent consumer depends on the circumstances." *Brookfield*, 174 F.3d at 1060 (citations omitted).

■ As discussed previously, YKK sells its goods to the following categories of consumers: (1) name-brand and private-label clothing manufacturers (e.g. Levi Strauss and The Gap); (2) the makers of other products ranging from wetsuits to sleeping bags; (3) "assemblers" who buy and assemble zipper components; and (4) "jobbers" who act as distributors.

Defendants contend that their customers are less likely to be confused than ordinary consumers because they are commercial purchasers who can be reasonably expected to exercise a higher degree of care in their purchasing decisions. "Where the relevant buyer class is composed solely of professional or commercial purchasers, it is reasonable to set a higher standard of care than exists for consumers." McCarthy § 23:101; *see also Walter v. Mattel, Inc.*, 31 F.Supp.2d 751, 761 (C.D.Cal.1998). On the other hand, as noted above, the survey conducted by Defendants' expert demonstrated substantial potential for confusion even by these sophisticated buyers.

Nonetheless, the Court finds that this factor weighs against a finding of a likelihood of confusion.

### (7) Defendants' intention in selecting the mark

■ "When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." *See Official Airline Guides*, 6 F.3d at 1394. Moreover, "[w]hen the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354. And although "a showing of good faith [by a defendant] is not very probative as to the determination of likelihood of confusion, a knowing adoption and appropriation of a prior user's mark is 'entitled to great weight on the issue of likelihood of confusion.'" *Hillerich & Bradsby Co. v. Palm Springs Golf Company*, 215 U.S.P.Q. 680, 684 (quoting *Golden Door, Inc. v. Odisho*, 646 F.2d 347, 208 U.S.P.Q. 638 (9th Cir. 1980)).

Defendants go to considerable lengths to explain that they acted in good faith and their choice of "YPP" had nothing to do with that mark's being quite similar to the "YKK" used by Plaintiff, the worldwide leader in zippers and related products. First, they contend that their mark needed to start with the letter "Y" because "Y" looks like an unzipped zipper. In support, YPP points to a number of other zipper companies with marks that begin with the

letter "Y." [5] YPP notes that a number of zipper companies utilize the "Y" as an unzipped zipper image in their advertisements, although YPP does not do so itself. Second, Defendants claim that YPP was chosen based upon Korean parables, although those parables are not described in the briefs. Third, Defendants maintain that YPP signifies a "progressive and dynamic company" because " 'PP' are letters that point to the right" and therefore "depict progression." Finally, YPP's president has testified that YPP's similarity to market-leader's YKK mark had nothing to do with Jungoo's choice of marks.

Defendants' story of how they came to choose the "YPP" name is called into serious doubt, however, by a number of documents that YPP turned over during discovery only upon the threat of sanctions from the Court. These documents concern the naming process that occurred back in 1997 when Jungwoo was in the process of choosing a name for its American zipper company. Jungwoo hired one of the world's leading branding companies, Interbrand, to help it make a naming decision. In the "Interim Report on the Development of Brand Name" sent to Jungwoo in October 1997, Interbrand acknowledged that YKK was the leading global brand and presented Jungwoo with a number of potential

marks that bore no resemblance to YKK apart from the fact that they were all combinations of three letters. Initially proposed were CLU, TYE, PAL, SAW, COG, CUE, ZQZ, ZDC, ROP, ZOZ, CPV, and CST. In response to Interbrand's suggestions, Jungwoo agreed that a number of the proposed names were good, but rejected them all and requested that Interbrand work on names beginning with the letter "Y." Jungwoo's October 1997 letter to Interbrand stated that "In consideration of high recognition on YKK(overseas), YBS(in Korea), the word containing 'Y' is desired." No mention is made of "Y" being desirable because it resembles an open zipper. Heeding Jungwoo's desires, Interbrand returned in November with a number of new names, including some that began with the letter "Y." But in Interbrand's list of final recommendations, the top four recommended names did not begin with "Y", and only "YCC" of the "Y" names was recommended at all. Only after Jungwoo rejected these names did the "YPP" mark emerge.[6]

The documents themselves strongly suggest that Defendants chose the YPP mark because of its similarity to the YKK mark. Particularly damning is the letter sent by Jungwoo to Interbrand in which Jungwoo

---

**5.** As Plaintiff points out in its Reply brief, Defendants fail to provide evidence that these alleged zipper companies have actually used their marks beginning with the letter "Y" in commerce in the U.S. The deposition testimony of a number of witnesses with great familiarity with the zipper industry demonstrates that these alleged companies are, at best, relative unknowns in the U.S. zipper market.

**6.** Moreover, the events surrounding the production of the documents chronicling the evolution of the name casts further suspicion on Jungwoo's motivations for choosing YPP. Although the documents were responsive to discovery served on YPP on October 13, 2000, and March 21, 2001 and on Jungwoo on March 21, 2001, Jungwoo did not produce the

documents until September 24, 2001. Jungwoo produced the documents only after being served with a proposed motion for sanctions for the spoliation of evidence, which had been prompted by YPP's president's deposition testimony that the documents had been lost, stolen, or destroyed some time after the date that Plaintiff filed the instant trademark infringement lawsuit. At oral argument, counsel for YPP argued that any delay in producing the documents was due to the fact that Mr. Kim and YPP are located in the U.S. and parent Jungwoo is located in Korea. Defendants contend that Kim requested all relevant documents, but that Jungwoo initially made a mistake and sent Kim an incomplete set of documents.

tells the branding company that "In consideration of high recognition on YKK(overseas), YBS(in Korea), the word containing 'Y' is desired."

In comparison with the hard evidence provided by such documentation, Defendants' assertions that YPP was chosen based upon Korean proverbs, the "dynamic and progressive" nature of the letters "PP", or the letter "Y" 's resemblance to an open zipper lack evidentiary support and simply strain credulity.

The Court finds that this factor weighs strongly in favor of Plaintiff YKK.

*(8) likelihood of the expansion of product lines.*

Both parties agree that this factor is irrelevant because they are already direct competitors.

*Weighing the factors*

■ The preceding analysis demonstrates that the *Sleekcraft* factors weigh heavily in favor of the Plaintiff. The strength of the YKK mark, the proximate nature of the goods, the similarity of the marks, and the parties' status as direct business competitors support the conclusion that there is a likelihood of confusion. Moreover, Defendant Jungwoo's decision to choose a brand name starting with the letter "Y" and followed by two more letters "[i]n consideration of high recognition of YKK(overseas)..." implies that Jungwoo believed that consumer confusion was likely. The only *Sleekcraft* factor weighing in favor of the Defendants is the degree of care that is typically exercised by the purchasers of YPP's and YKK's products. Nonetheless, the Defendants' own survey, conducted by their expert, suggests that even among this group of sophisticated consumers, a significant amount of confusion is likely to occur. In addition, the Court determines that no reasonable trier of fact could conclude that the marks are dissimilar. See *Entrepre-*

*neur Media, Inc. v. Smith,* 279 F.3d 1135, 1145 (9th Cir.2002).

The Court holds that Defendants' use of the YPP mark creates a great likelihood of confusion between its zippers and related products and those of Plaintiff YKK. Accordingly, summary adjudication of Plaintiff's trademark claims is granted.

*B. Trademark dilution claim*

■ The Federal Trademark Dilution Act protects a famous mark from the dilution of the distinctive quality of that mark that results from its unauthorized commercial use. See 15 U.S.C. § 1125(c). The California anit-dilution statute is similar to the federal one and is subject to the same analysis. Therefore, Plaintiff's federal and state trademark dilution claims are discussed and analyzed together. *See Panavision Int'l L.P. v. Toeppen,* 141 F.3d 1316, 1324 (9th Cir.1998).

The Court finds the reasoning of trademark scholar J. Thomas McCarthy relevant and persuasive here. McCarthy believes that recovery on a theory of trademark dilution is inappropriate when the plaintiff and defendant are competitors offering similar goods:

It is difficult to understand why an anti-dilution law is invoked when the parties operate in competitive or closely related product or service lines. The legal theory of anti-dilution was conceived to protect strong marks against a diluting use by a junior user in a product or service line far removed from that in which the famous mark appears. Thus, using the anti-dilution law when the parties are competitors in the same market sounds a dissonant and false note. Why the need to invoke the "super weapon" of the anti-dilution law to resolve what appears to be a garden variety infringement case?...

The anti-dilution laws should only be rarely and sparingly applied to cases

involving parties selling in the same market. The anti-dilution theory was not designed or conceived to apply to such cases and it makes a poor fit. It is the wrong tool for the job. Its mis-use in competitive situations is bound to upset the balance of free and fair competition and deform the anti-dilution doctrine.

McCarthy § 24:72 (Author's Comment).

The Court denies summary adjudication of the trademark dilution claims in favor of Plaintiff.

### IV. Conclusion

The Court hereby **GRANTS** Plaintiff's Motion for summary adjudication of its claims for trademark infringement and unfair competition and **DENIES** Plaintiff's Motion for summary adjudication of its claims for trademark dilution. (Docket # 81)