**HALO MANAGEMENT, LLC, Plaintiff,**

v.

**INTERLAND, INC., Defendants.**

**No. C–03–1106 MHP.**

United States District Court,
N.D. California.

Nov. 17, 2003.

Howard A. Janssen, Esq., Janssen Doyle, LLP, Lafayette, CA, Richard Proctor Doyle, Jr., Crosby, Heafey, Roach & May, San Francisco, CA, Mitchell Scott Rosenfeld, Capstone Law Group LLP, San Mateo, CA, for Plaintiff.

C. Celeste Creswell, Joseph D. Wargo, Wargo & French LLP, Atlanta, GA, Carla B. Oakley, Morgan, Lewis & Bockius LLP, Eric J. Sinrod, Duane Morris LLP, San Francisco, CA, for Defendant.

## MEMORANDUM AND ORDER

### Motion for Preliminary Injunction

PATEL, Chief Judge.

In March 2003, plaintiff Halo Management, LLC ("HM") brought this civil action against defendant Interland, Inc., seeking monetary and injunctive relief for alleged violations of federal trademark law, *see* 15 U.S.C. §§ 1114, 1125, and of California's Business and Professional Code. *See* Cal. Bus. & Prof.Code § 17203. At the heart of HM's complaint is Interland's use—in a variety of contexts—of the word mark "HALO," a mark for which plaintiff holds a registered United States trademark.

Before the court is HM's motion for a preliminary injunction. HM has asked the court to prohibit Interland from using the "HALO" mark, as well as any variation thereof, in its business enterprise. The court has considered fully the parties' arguments, and for the reasons set forth below, the court rules as follows.

### BACKGROUND [1]

Founded as a sole proprietorship, HM is a small, privately-held limited liability corporation based in Los Altos, California. Focusing on internet-related services, HM offers email, web-search functions, and web-hosting to its list of subscribers and customers.[2] Interland, Inc. is a publicly-traded corporation, attracting customers through, *inter alia,* its listing on the NAS-DAQ stock exchange. Like HM, Interland offers an array of internet-based services to its subscribers and customers. As a part of its business practices, Interland employs the web address "bluehalo.com," often redirecting visitors to the "bluehalo.com" site to Interland's corporate homepage ("interland.com"). Interland also displays the symbol "blueHALO" prominently throughout its corporate, sales, and marketing materials, often—if not uniformly—casting the mark in the color blue.

### I. History of the Relevant Trademark

In late 1999, HM filed a United States trademark application for the word mark "HALO," [3] By June 25, 2002, HM had registered the "HALO" mark,[4] *see* Ashby Dec., Exh. 3, identifying two classes of internet- and computer-focused goods and services in this registration:

CLASS 038—Electronic communication and commerce services, namely, elec-

---

1. Unless otherwise noted, all facts in this section have been culled from the parties' moving papers.

2. According to HM, it has made these services available to its customers since March 14, 2002, the date on which it filed a statement of use for the "HALO"® mark.

3. HM's application was assigned serial number 75/870,390.

4. HM's mark received United States Trademark Registration Number 2,586,017.

tronic transmission of voice, video, and data via computer terminals, electronic mail services, providing on-line chat rooms for transmission of messages among computer users in the field of business, legal, and intellectual asset management, and providing multi-user access to a global computer network. CLASS 042—Providing a search engine for online searching and retrieving of information on a global computer network; hosting the web sites of others on a computer server for a global computer network; on-line, non-downloadable electronic newsletters in the field of business, legal, and intellectual asset management; and intellectual property consultation.

*Id.*

After HM filed its 1999 trademark application for "HALO,"[5] Interland filed an intent-to-use[6] trademark application for the mark "blueHALO Architecture." *See* Ashby Dec., Exh. 5 (dated June 13, 2002).[7] Interland's trademark application identified web-hosting as the service targeted by the mark, drawing Interland's desired mark into close linguistic and subject affinity with HM's existing "HALO" mark. The Patent & Trademark Office ("PTO") rejected Interland's "blueHALO Architecture" application on March 7, 2003. *See* Ashby Dec., Exh. 6. Citing 15 U.S.C. section 1052(d) of the Lanham Act, the PTO found Interland's proposed mark too likely to cause confusion, too likely to cause mistake, or too likely to deceive in light of HM's existing mark to merit trademark

registration. *Id.* Because the two marks were visually and phonetically comparable,[8] and because the services Interland and HM offered were, in this instance, closely related, the PTO rejected Interland's application. *Id.* (adding that any doubt regarding the likelihood of confusion was to be resolved in favor of HM's existing mark) (citing *In re Hyper Shoppes (Ohio), Inc.,* 837 F.2d 463 (Fed.Cir.1988)).

Interland filed a second trademark application a short time later. In this second application, Interland substituted the phrase "and Design" for "Architecture," seeking to register the mark "blueHALO and Design." *See* Ashby Dec., Exh. 7 (noting that the mark was "lined" for the color blue). Again citing 15 U.S.C. section 1052(d), the PTO refused Interland's second application, once again noting the likelihood of confusion and the close affinity between the goods and services offered by the parties. Interland's mark, the PTO concluded, was sufficiently likely to spur confusion that Interland's application must be refused. *See* Ashby Dec., Exh. 8.

## II. *The Parties' Relationship*

Though the PTO rejected Interland's two efforts to register a "blueHALO"-based mark, Interland continued to employ the "blueHALO" moniker in its business ventures. *See, e.g.,* Ashby Dec., Exh. 9 (Transcript of Fair Disclosure Financial Network Interview) (" ... new products such as blueHALO are raising the bar ....."). HM learned of Interland's ongo-

---

5. The court recognizes, of course, that the filing of Interland's "blueHALO Architecture" application predated the actual registration of HM's "HALO" mark by some twelve days. *Compare* Ashby Dec., Exh. 3 (dated June 25, 2002), *with id.* Exh. 5 (dated June 13, 2002).

6. The application was of an "intent-to-use" ilk, signaling that Interland had not yet used the mark actively.

7. Interland's "blueHALO Architecture" application received the serial number 78/135,621.

8. On this note, the PTO confirmed that the "mere addition" of another term or phrase to an already registered mark did not wholly vitiate the likelihood of confusion. Ashby Dec., Exh. 6 (citations omitted).

ing use in January 2003, promptly asking Interland to alter the mark used in Interland's web-hosting services in order to dissipate any potential confusion. *See* Ashby Dec., Exh. 10 at 1. Interland confirmed receipt of HM's initial query, but Interland did not respond to HM's demand.

In a second, similarly-worded letter, HM reiterated its name-change request. *Id.* at 2. On February 18, 2003, Interland formally responded to—and refused—HM's demand. Disputing the contention that confusion was likely to grow from Interland's use of the "blueHALO" mark, Interland offered a catalog of reasons supporting its continued use of the "blueHALO" mark: One, the parties' marks were visually and phonetically distinguishable; two, the addition of a "blue" prefix and of an "and Design" suffix adequately distinguished HM's unadorned "HALO" mark; three, the uses to which the parties' marks were put were sufficiently distinct; four, the "blueHALO and Design" mark was directed at sophisticated web users; five, Interland's use of "HALO" was purely acronymic; six, Interland's use of the "HALO" term combined with pervasive use of the term "Interland"; and, seven, HM's enforcement efforts were inherently selective. *See* Ashby Dec., Exh. 11. Convinced that HM's position and request were untenable, Interland pledged to defend itself aggressively against any and all trademark-violation allegations. *Id.*

Interland, in fact, continued to use the "blueHALO" moniker in its press releases, denoting the term with a superscript "SM," *see, e.g.,* Ashby Dec., Exh. 12, often using the mark in combination with "shared" or "Architecture," and rerouting all visitors to the "bluehalo.com" website directly to Interland's corporate homepage. *See* Ashby Dec. ¶ 9. In response, HM filed this action on March 14, 2003. *See* Compl. at 1. Since the initiation of this action, Interland has not discontinued its use of the "blueHALO" mark; HM now seeks a preliminary injunction mandating that Interland do so.

## LEGAL STANDARD

▮ A preliminary injunction is a "provisional remedy." *Napa Valley Pub. Co. v. City of Calistoga,* 225 F.Supp.2d 1176, 1180 (N.D.Ca.2002) (Chen, Mag. J.) (citation omitted). Aimed at preserving the status quo and at preventing the occurrence of irreparable harm during the course of litigation, *id.,* preliminary injunctions may be issued where the moving party has established two prerequisites for equitable relief: one, a threat of irreparable injury and, two, the inadequacy of available legal remedies. *See* Fed.R.Civ.P. 65 (placing this type of injunctive relief within the bounds of the court's discretion and equitable power); *Easyriders Freedom F.I.G.H.T. v. Hannigan,* 92 F.3d 1486, 1495 (9th Cir.1996); *Big Country Foods, Inc. v. Board of Educ. of Anchorage Sch. Dist.,* 868 F.2d 1085, 1087 (9th Cir.1989).

▮ In general, a preliminary injunction is appropriate where a plaintiff can demonstrate "either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor." *Southwest Voter Registration Education Project v. Shelley,* 344 F.3d 914, 917 (9th Cir.2003) (en banc; per curiam) (citing *Clear Channel Outdoor, Inc. v. City of Los Angeles,* 340 F.3d 810, 813 (9th Cir.2003), and *Walczak v. EPL Prolong, Inc.,* 198 F.3d 725, 731 (9th Cir.1999)); *see also Sun Microsystems, Inc. v. Microsoft Corp.,* 188 F.3d 1115, 1119 (9th Cir.1999) (distilling four relevant factors into this two part test); *Los Angeles Memorial Coliseum Comm. v. National Football League,* 634 F.2d 1197, 1200–01 (9th Cir.1980) (listing the likelihood of plaintiff's success on the merits, the threat

of irreparable harm to the plaintiff if the injunction is not issued, the relative balance of harm between the parties, and the public interest as factors to consider). The two components of this test sit on a kind of sliding scale or "continuum," *Southwest Voter*, at 917; thus, "the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." *Id.* at 917–18 (noting, too, that review of a district court's preliminary injunction decision is "limited and deferential"); *see Miller v. California Pac. Med. Center*, 19 F.3d 449, 456 (9th Cir.1994) (en banc) (citations omitted).[9]

 The test for preliminary injunctions in the trademark context generally mirrors the test used in other civil proceedings. *See Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir.1988). But courts assessing preliminary injunction motions in the trademark infringement context focus on a specific question, viz., whether the moving party can show a likelihood of consumer confusion. *See Brookfield Communications, Inc. v. West Coast Ent't Corp.*, 174 F.3d 1036, 1052 n. 15 (9th Cir.1999) (holding that the moving party "must establish that it is likely to be able to show … a likelihood of confusion");[10] *see also Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir.2003) (noting that injunctions are proper in trademark cases where the proper balance of four factors—viz., the likelihood of success on the merits; the potential for irreparable harm; the potential for adverse public impact; and the balance of harms between the parties—exists). As in all occasions in which a court issues a preliminary injunction, Federal Rule of Civil Procedure 65(d) requires that the court make the injunction "specific in terms … describ[ing] in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." Fed.R.Civ.P. 65(d). This mandate for specificity ensures that those against whom an injunction is drawn receive fair and precise notice of what conduct is prohibited. *See Union Pac. R.R. v. Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000).[11]

9. This two-part test's phrasing—viz., "either … or"—implies that the test is a disjunctive one, i.e., that the moving party need only show "either" a combination of probable success and irreparable injury "or" the existence of serious questions tipping sharply in his / her favor to merit equitable relief. *Id.; see F.D.I.C. v. Garner*, 125 F.3d 1272, 1277 (9th Cir.1997). As the Ninth Circuit has reminded, however, the two prongs of this test are more interrelated than disconnected; they represent two poles of a sliding scale along which the "required degree of irreparable harm increases as the probability of success decreases." *America West Airlines, Inc. v. National Mediation Bd.*, 119 F.3d 772, 777 (9th Cir.1997) (implying the converse as well); *see also Big Country Foods*, 868 F.2d at 1088 (noting that the moving party must "demonstrate a significant threat of irreparable injury, irrespective of the magnitude of the injury") (internal citations omitted).

10. Federal trademark infringement and state unfair competition are in this sense coextensive: Where a likelihood of confusion has been established for infringement purposes, it has been established for unfair competition purposes as well. *See Century 21*, 846 F.2d at 1178; Cal. Bus & Prof.Code § 17200.

11. Federal Rule of Civil Procedure 65(c) provides that:

No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to be wrongfully enjoined or restrained.

*See* Fed.R.Civ.P. 65(c). In setting the amount of a bond, district courts are generally afforded wide discretion, *see Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733 (9th Cir.1999), and the bond amount may be zero where

*DISCUSSION*

The Ninth Circuit, as noted, has propounded a two-part test for determining whether a moving party is entitled to a preliminary injunction. *See, e.g., Sun Microsystems,* 188 F.3d at 1119. To succeed on a preliminary injunction motion, the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. *Southwest Voter,* at 917. The court will address each aspect of this test below.

But before the court can address the substance of HM's claim, the court must answer a determinative threshold question, viz., whether HM retains a protectable trademark interest in the first instance. *See Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar,* 179 F.3d 1244, 1249 (9th Cir.1999). Interland argues that HM possesses no such interest, asserting, *inter alia,* that HM has abandoned its relevant mark, that HM cannot establish priority because its registration is subject to cancellation, and that the germane mark "field" is so crowded with "halo"-based marks that HM's putative rights are otherwise unenforceable. *Cf.* 15 U.S.C. § 1057(b) ("A certificate of registration of a mark . . . shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce . . . ."). Because the existence of trademark rights in the first instance impacts the likelihood of HM's success on the merits of its federal

and state law claims, the court addresses each of these questions in turn.

### I. HM's Trademark Rights and Success on the Merits

#### A. Abandonment and "Naked Licenses"

 "A trademark owner may grant a license and remain protected," the Ninth Circuit recently noted, "provided quality control of the goods and services sold under the trademark by the licensee is maintained." *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.,* 289 F.3d 589, 595–96 (9th Cir.2002) (citing *Moore Bus. Forms, Inc. v. Ryu,* 960 F.2d 486, 489 (5th Cir.1992)). A trademark holder may *not* grant a license and remain protected, however, when he / she grants an "[u]ncontrolled or 'naked'" license, i.e., a license that "fails to exercise adequate quality control over the licensee." *Barcamerica,* 289 F.3d at 596; *see McCarthy on Trademarks and Unfair Competition* § 17:6, at 17–9 (4th ed. 2003) ("Licensing a mark without adequate control over the quality of the goods or services sold under the mark by the licensee may cause the mark to lose its significance as a symbol of equal quality—hence, abandonment."). Where a trademark holder enters a "naked license," the Ninth Circuit explains, the holder has effectively "abandoned the trademark," *id.* (citation omitted); where a mark is "abandoned," the owner is "estopped from asserting rights to [that] mark." *Id.* (quoting *Moore,* 960 F.2d at 489).

 Because abandonment through "naked" licensing "is purely an involuntary

---

there is no evidence that a party will suffer damages from the issuance of an injunction. *See Gorbach v. Reno,* 219 F.3d 1087, 1092 (9th Cir.2000). Interland has not requested a bond, nor has it submitted any evidence (aside from unsupported assertions of monetary risk) regarding its likely damages; the

court will thus not address the bond question here. *Cf. Connecticut General Life Ins. Co. v. New Images of Beverly Hills,* 321 F.3d 878, 882 (9th Cir.2003) (refusing to address a bond-related question on appeal where the district court was not presented with the bond issue).

forfeiture of trademark rights," courts have not required evidence of "any subjective intent to abandon the mark." *Id.* (quoting *McCarthy* § 18:48 at 18–76–18–78). A party may thus lose the protection of the mark without intending to do so. *Id.* But a party may not lose the protection of the mark unless the proponent of a "naked license" theory satisfies a "stringent standard" of proof. *Id.* (quoting *Moore*, 960 F.2d at 489); *see also Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 548–548 (10th Cir.2000) ("Because naked licensing if established is treated as an abandonment of the trademark, which triggers the loss of trademark rights against the world, anyone attempting to show such abandonment via naked licensing faces a stringent burden of proof.") (citing *Moore*, 960 F.2d at 489, and *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1121 (5th Cir. 1991), *aff'd*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)). Interland meets its "stringent standard" of proof in this instance.

Effective July 1, 2002, HM entered a "License, Consent to Use and Registration Agreement" with Planet Halo, Inc. ("Planet Halo"), a California corporation. *See* Ashby Supp. Decl., Exh. 7.[12] Through this agreement, HM granted Planet Halo a license to use HM's mark—and "any eventual registrations based thereon"—and invested Planet Halo with the right to "worldwide use and registration." *Id.* When it entered this license agreement, Planet Halo agreed only "to employ reasonable commercial efforts to maintain the positive business value of the HALO mark." *Id.* No explication of this provision is provided in the agreement, and the agreement specifies no express right to inspect or to supervise Planet Halo's "ef-

forts." *Id.* (permitting either party to "assign th[e license] Agreement so long as any such assignee agrees to the terms and conditions [t]herein"). In fact, the licensing agreement invests HM with no express contractual right to inspect or to monitor Planet Halo's use of the "HALO" mark.

At first blush, this lack of an express contractual right to inspect and to supervise Planet Halo's efforts suggests that HM's assignment to Planet Halo was a "naked" one. By the terms of the contract, HM retains no right to monitor Planet Halo's "commercial efforts" in an immediate or meaningful way; HM retains, rather, only the right to have Planet Halo engage in "reasonable" efforts to maintain the "positive business value" of the mark. Neither of these inherently amorphous terms is quantified or defined in the agreement; neither of these terms place any distinct or firm restrictions on the quality of goods Planet Halo may produce or disseminate; and neither of these terms permit HM to terminate the license should Planet Halo derogate its supposed quality obligations. *See Barcamerica*, 289 F.3d at 595–96. However plain HM's desire to maintain the "positive business value" of its mark, nothing in the license agreement affirmatively permits HM to control the quality of goods and services bearing that mark. *Id.* The court thus finds that the terms of the licensing agreement suggest that HM's license to Planet Halo was a "naked" one.

 As the Ninth Circuit has noted, of course, "[t]he lack of an express contract right to inspect and [to] supervise a licensee's operation is not conclusive evidence of lack of control." *Id.* at 596 (citation omitted). Where circum-

**12.** According to plaintiff, the intent of the license was to permit Planet Halo to use the "HALO" mark in the development and marketing of a type of hand-held computer de-

vice, a product plaintiff deems distinct from and peripheral to the kind of services plaintiff purports to offer.

stances informing or surrounding the "licensing arrangement [indicate] that the public will not be deceived," *Barcamerica* observes, the lack of a formal quality control provision does not automatically divest a trademark holder of protection. *Id.* Only where the conduct of the holder also suggests that it has relinquished—or failed to maintain—quality control does a "naked license" emerge.

HM's extra-contractual conduct suggests that it relinquished quality control here. Nothing in the record suggests that Planet Halo was versed in or familiar with HM's own quality control efforts, and HM's evidence of ongoing quality monitoring is insufficient to demonstrate adequate control. HM does, to be sure, submit a pair of related email messages—both dated over six months after the execution of the licensing agreement and two months before the commencement of this action—seeking "reassurance" from Planet Halo regarding its license obligations and asking to review "samples" of Planet Halo's relevant products. *See* Ashby Supp. Decl., Exh. 8 (dated January 21, 2003, and February 19, 2003). Thanking Planet Halo for "promoting a positive image" (though this "positive image" term is left unexplored) and noting that, for fear of "a loss of rights," it is "kind of important to check up" on Planet Halo's use of the mark, these emails imply at least a "minimal effort to monitor quality," *Barcamerica*, 289 F.3d at 597 (citation omitted); Ashby Supp. Decl., Exh. 8; that is, these emails show that HM did not forsake its quality monitoring efforts completely.

But HM's "minimal effort[s] to monitor quality" are not sufficient to prove HM's license a non-"naked" one. HM's putative efforts at quality control are too infrequent and too indeterminate to credit. As in *Barcamerica*, nothing in the record establishes "when, how often, and under what circumstances" HM can—or will—exercise any kind of quality control. *Id.* As in *Barcamerica*, moreover, nothing in the record "demonstrate[s] any knowledge of or reliance on the actual quality controls used." *Id.* Planet Halo and HM did not at the time of the execution of the licensing agreement—and do not now—"have the type of close working relationship required to establish adequate quality control in the absence of a formal agreement." *Id.* (citations omitted). Through its lack of meaningful and sustained efforts to monitor quality, HM has left Planet Halo to use the "HALO" mark largely as it sees fit. In so doing, HM has confirmed that the license to Planet Halo was a "naked" one, both by the terms of the license agreement and by the practice of the parties.

 When determining whether a license is "naked," "what matters" is whether the licensor "played [a] meaningful role in holding [a product] to a standard of quality—good, bad, or otherwise." *Id.* at 598; *see also McCarthy*, § 18:48, at 18–82 ("A mark can become abandoned by any act or omission of the registrant which causes the mark to lose its significance as an indication of origin."). Though it is "difficult, if not impossible[,] to define in the abstract exactly how much control and inspection is needed to satisfy the requirement of quality control over trademark licensees," *McCarthy* § 18:55, at 18–94; *see TMT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876, 885 (7th Cir. 1997) ("Naked licensing law is full of contradictory strains . . . ."), the court is not unable to make the necessary determinations here. HM licensed the relevant mark to Planet Halo in a document lacking a formal or meaningful quality control clause, and HM's efforts to engage in affirmative, extra-contractual quality control efforts have been at best inconsistent, unsystematic, and unconvincing. The court thus finds that HM engaged in "naked"

licensing and that, in so doing, HM forfeited its rights in the relevant mark.

Though the court so concludes, out of an abundance of caution, the court finds it prudent to consider the remaining issues in this action, both those related to HM's predicate trademark rights and those related to HM's motion for a preliminary injunction.

B. *Cancellation, Priority, and Sufficient Use in Commerce*

 As a rule, a trademark registration, even if incontestable, is invalid if it was fraudulently obtained. *See* 15 U.S.C. § 1115(b)(1). Under federal law, fraudulent trademark registrations are subject to a petition to cancel "[a]t any time," *see id.* at § 1064(3), but when alleging that a mark has been secured by fraudulent means, a party shoulders a heavy burden. To establish that a mark was registered fraudulently, a party must prove two things, both by clear and convincing evidence: First, the party must identify a deliberate attempt by the registrant to mislead the PTO, identifying statements or representations that prove more than mere error or inadvertence. *See, e.g., Orient Express Trading Co. v. Federated Dep't Stores, Inc.*, 842 F.2d 650, 653 (2d Cir.1988). Second, the party must show that misstatements were made "with respect to a material fact—one that would have affected the PTO's action on the applications." *Id.* Neither of these analyses leave "room for speculation, inference or surmise," and the court must resolve any doubt "against the charging party." *See Smith Int'l Inc. v. Olin Corp.*, 1981 WL 48127, 209 U.S.P.Q. 1033, 1044 (Trademark Tr. & App. Bd.1981); *see also Yocum v. Covington*, 1982 WL 52024, 216 U.S.P.Q. 210, 216 (Trademark Tr. & App. Bd.1982); *Woodstock's Enter., Inc. v. Woodstock's Enter., Inc.*, 1997 WL 440268, 43 U.S.P.Q.2d 1440 (Trademark Tr. & App. Bd.1997) ("Fraud in a trademark cancella-

tion is something that must be 'proved to the hilt' . . . .").

 To discharge its heavy burden, Interland asserts that the "statement of use" HM submitted to the PTO was doubly misleading, so much so that HM cannot now claim protectable trademark rights. First, Interland contends, all of HM's users were attracted to HM's services by something other than conventional (or actual) sales efforts, namely, personal relations with Mr. Ashby; this limited type of customer solicitation, Interland avers, controverts HM's claim in its "statement of use" that HM was engaging in "actual" sales efforts. Second, Interland adds, none of HM's users made use of the full panoply of goods and services listed in the mark's notice of allowance, *see* Ashby Decl., Exh. 1; this limited type of customer use, Interland asserts, proves HM's "statement of use" untruthful to the extent it claimed use of the mark in connection with *all* the identified services.

Interland's two premises are not unpersuasive. Most, if not all, of HM's users have some personal link to Mr. Ashby, whether through high school attendance or through professional affiliation. Further, nothing in the record suggests that HM—or any HM customer—ever made use of "on-line chat rooms" or "on-line, non-downloadable electronic newsletters." *See* Ashby Decl., Exh. 1. In this sense, HM's "statement of use" did offer an imprecise description of HM's sales and operational efforts.

It does not necessarily follow, however, that HM (or Ashby) made a deliberate attempt to mislead the PTO, nor that HM offered misleading information with respect to a fact sufficiently material to affect the PTO's processes. *See Orient Express*, 842 F.2d at 653. The court is mindful of its obligation to resolve any doubts in HM's favor, just as it is mindful

of the applicable clear and convincing standard of proof. Persuasive as Interland's assertions may be, Interland has not shown by clear and convincing evidence that HM engaged in fraudulent conduct when registering the mark. HM's and Ashby's representations in the "statement of use" may have been imprecise or overly optimistic, but the record does not show by clear and convincing evidence an intent to defraud the PTO vis-a-vis a material aspect of the registration process, The court thus cannot find HM's mark subject to cancellation due to fraudulent registration.

■ But the fact that HM did not fraudulently register the "HALO" mark leaves unanswered a second question, viz., whether HM has "used" its mark sufficiently to merit trademark protection under federal law. Decades ago, the Supreme Court explained that "the right to a particular mark grows out of its use, not its mere adoption." *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918). For this reason, the Lanham Act grants trademark protection to those marks that are "used in commerce." *See* 15 U.S.C. § 1051; *cf. Planned Parenthood Fed'n of Am., Inc. v. Bucci*, 1997 WL 133313, 42 U.S.P.Q.2d 1430, 1434 (S.D.N.Y.1997) (noting that the "use in commerce" language operates, in the first instance, as a "jurisdictional predicate"). This "used in commerce" language, the Ninth Circuit has noted, focuses on marks that are used to identify and to distinguish goods or services, "typically [ ] when a *mark is used in conjunction with the actual sale of goods or services.*" *See Brookfield*, 174 F.3d at 1051–1052 (emphasis added). Only where a mark "is used in public in a manner that creates an association among consumers between the mark and the mark's owner," the Ninth Circuit has reasoned, does the mark merit trademark protection. *Id.* (noting that the "purpose of a trademark is to help con-

sumers identify the source," so "a mark cannot serve [its] source-identifying function if the public has never seen [it]") (citing, e.g., *Armstrong Paint & Varnish Works v. Nu–Enamel Corp.*, 305 U.S. 315, 334, 59 S.Ct. 191, 83 L.Ed. 195 (1938)); *see also* 15 U.S.C. § 1127.

To emphasize this "use in commerce" mandate, and to clarify the meaning of the "used in commerce" term, Congress amended the Lanham Act in 1988 to make plain that only through "the bona fide use of a mark in the ordinary course of trade, and not [use] made merely to reserve a mark," may trademark protection vest. *See* 15 U.S.C. § 1127; *see also id.* at § 1127(B)(2) (stating that "a mark shall be deemed to be in use in commerce ... *on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce,* or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services") (emphasis added).

Despite this statutory explication, however, court application of the "used in commerce" term has not been entirely consistent. Some courts, for example, have deemed advertising and promotional activities, when unaccompanied by the actual rendering of services, insufficient to constitute "use in commerce." *See, e.g., Buti v. Perosa*, 139 F.3d 98, 105 (2d Cir.1998); *Electronic Communications, Inc. v. Electronic Components for Industry Co.*, 443 F.2d 487, 492 (8th Cir.1971) ("The mere advertisement of words or symbols without application to the goods themselves is insufficient to constitute a trademark,"). Other courts, by slight contrast, have located sufficient "use in commerce" where pre-sale marketing efforts were sufficiently extensive to establish exercise of the mark. *See, e.g., New West Corp. v. NYM*

*Co. of California, Inc.*, 595 F.2d 1194, 1200 (9th Cir.1979); *cf. Brookfield,* 174 F.3d at 1052 ("[B]oth the express statutory language and the case law [ ] firmly establish[ ] that trademark rights are not conveyed through mere intent to use a mark commercially.") (citing, e.g., *Allard Enters. v. Advanced Programming Resources, Inc.,* 146 F.3d 350, 356 (6th Cir.1998); *Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 504 (7th Cir.1992); *Hydro–Dynamics, Inc. v. George Putnam & Co.,* 811 F.2d 1470, 1473–74 (Fed.Cir.1987)). In its moving papers, HM asks the court to adopt a more expansive "use in commerce" test, finding adequate use where HM *offered* a number of services, even if those services were not widely *rendered. Cf. CCBN.com, Inc. v. c–call.com, Inc.,* 73 F.Supp.2d 106, 109–10 (D.Mass.1999).

With part of HM's argument, the court agrees. The Ninth Circuit has held that trademark rights (and protection) can vest before any goods or services are actually sold if "the totality of [the holder's] prior actions, taken together, [can] establish a right to use the trademark." *See New West,* 595 F.2d at 1200–01. Thus, to the extent Interland argues that Ninth Circuit law demands that services be *rendered* (i.e., actually given or supplied), Interland subtly misreads applicable and controlling law.

Further, to the extent Interland suggests that HM's use of the mark is otherwise inadequate in this instance, HM misinterprets the context-focused test set forth in *New West.* To be sure, HM's "use," as Interland contends, has been less than thoroughgoing; HM has rendered its services to a very limited number of consumers, many of whom have a personal or professional connection to Mr. Ashby.[13] But, to promote its mark and attendant offerings, HM has established an internet home page—or set of pages—from which typical users can access HM's alleged services. *See Intermatic v. Toeppen,* 947 F.Supp. 1227, 1239 (N.D.Ill.1996) (quoting 1 Gilson, *Trademark Protection and Practice,* § 5.11[2], p. 5–234 ("[T]here is little question that the 'in commerce' requirement would be met in a typical Internet message.")). The creation and maintenance of these universally-available internet pages constitutes " '[u]se in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark,' " *Brookfield,* 174 F.3d at 1052 (quoting *New England Duplicating Co. v. Mendes,* 190 F.2d 415, 418 (1st Cir.1951)); it places the mark in the public domain, and it attaches the mark to HM's services in a readily accessible manner. *Cf. id.* (noting that "mere use [of a mark] in *limited* e-mail correspondence with lawyers and a few customers" proves insufficient to establish trademark rights) (emphasis added); *see also International Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco,* 329 F.3d 359, 381 (4th Cir.2003); *MicroStrategy Inc. v. Motorola, Inc.,* 245 F.3d 335, 341 (4th Cir.2001) ("As the Sixth Circuit recently put it, 'a plaintiff must show that it has actually used the designation at issue *as a trademark;* thus the designation or phrase must be used to perform [ ]' the trademark function of identifying the source of the merchandise to the customers.") (citing *Rock and Roll Hall of Fame v. Gentile Prods.,* 134 F.3d 749, 753 (6th Cir.1998)). In this way, HM's use is more extensive than the mere "putting one's mark 'on a business office door sign, letterheads, architectural drawings, etc.' or on a prototype displayed to a potential buyer."

---

**13.** According to plaintiffs, HM has as many as eight customers; some are Ashby-owned entities and one is HM's counsel at trial.

*Brookfield*, 174 F.3d at 1052 (citing *Steer Inn Systems, Inc. v. Laughner's Drive–In, Inc.*, 56 C.C.P.A. 911, 405 F.2d 1401, 1402 (Cust. & Pat.App.1969); *Walt Disney Prods. v. Kusan, Inc.*, 1979 WL 25051, 204 U.S.P.Q. 284, 288 (C.D.Cal.1979)). And, in this way, HM has used the mark in commerce sufficiently extensively to merit some manner of trademark protection.

### C. *Crowded Field*

■ As this court has noted, the popularity of a particular mark-related term may impact the strength of marks using that term. That is, where "crowded [trademark] field" is "hemmed in on all sides by similar marks on similar goods," this court has explained, the ability of any member of this field to prevent use by others is relatively weak. *PostX Corp. v. docSpace Co., Inc.*, 80 F.Supp.2d 1056, 1061 (N.D.Cal.1999) (Whyte, J.) (citations omitted); *see also Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir.2002).

■ In the trademark world, the word "halo" is a popular one. From "halosec.com" to "haloelectronics.com" to "Halo Platforms," the term "halo" appears in dozens of places, many in "a field which at least broadly would include or be related to plaintiff's business." *See PostX Corp.*, 80 F.Supp.2d at 1061 (citations omitted).[14] The relevant trademark field is, in short, "crowded."[15] Any individual user of the "halo" term thus lacks significant ability to prevent the use of "halo" by others in the field. *Id.*

Since the court has found that HM abandoned its mark through the "naked" licensing of the mark to Planet Halo, however, the court need not explore this "crowded field" question in great depth. Still, in response to an assertion in Interland's brief—specifically, that the "crowded field" divests HM's mark of *any* theoretical strength—it is worth noting that the relevant "crowded field" works only to make HM's mark weaker, which, in turn, impacts both the scope of protection the mark merits and HM's ability to protect that mark. *Id.* The existence of this "crowded field" does not, by itself, show that HM is unlikely to succeed in establishing *any* enforceable trademark rights at all. *Id.*

### II. *The Possibility of Irreparable Injury*

■ In trademark infringement actions, the primary issue is one of consumer

---

**14.** Like many analogous cases in this Circuit, *PostX* relies on *Miss World (UK), Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir.1988), in crafting its "crowded field" analysis. Interland follows this path as well, neglecting to mention that *Miss World* has been abrogated in part. As *PostX* plainly implies, the relevant portion of *Miss World* remains good law; still, the court pauses to note that *Miss World* is not the uniformly binding precedent Interland tacitly suggests.

**15.** Plaintiff is quite correct that the "field" must be defined with particular reference to the context in which a particular mark is used; for this reason, in assessing the ambit of the "field," the court does not consider business completely unrelated to the computer-related ventures plaintiff offers. But in asking the court to narrow the field so signifi-

cantly that the germane "crowd" disappears, plaintiff attempts to have it both ways: On the one hand, HM posits its products and services as so circumscribed that very few others use the "HALO" mark in the relevant business context; on the other, HM treats supposedly "peripheral" good and services—such as Planet Halo's hand-held device—as sufficiently proximate to the core of HM's business that some sort of accommodation is necessary to avert consumer confusion. The court does not believe that HM can tailor the "field" in a way that proves most strategically advantageous, and the court is not persuaded by HM's attempt to distinguish Planet Halo's goods. HM entered a license agreement with Planet Halo because of, *inter alia*, an affinity of goods and services; in so doing, HM made clear the scope of the relevant trademark field.

confusion. As the Supreme Court has noted, "[t]he law of unfair competition"—of which trademark infringement law is a part—"has its roots in the common-law tort of deceit: its general concern is with protecting consumers from confusion as to source." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 157, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989). The Ninth Circuit has used an eight factor test "to analyze the likelihood of confusion question in [ ] trademark infringement cases," *Dr. Seuss Enterprises, LP v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1404 (9th Cir.), *cert. dismissed*, 521 U.S. 1146, 118 S.Ct. 27, 138 L.Ed.2d 1057 (1997), building its approach on the multi-factored rubric first elaborated in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979). *Sleekcraft*'s eight factors ask the court to assess: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels are used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *Id.* at 348–49.[16] More "helpful guidelines" than firm "requirements," these eight factors are not analytical "hoops" through which courts must jump, nor are they intended to be applied mechanistically. *Eclipse Assocs., Ltd. v. Data General Corp.*, 894 F.2d 1114, 1118 (9th Cir.1990); *Sleekcraft*, 599 F.2d at 348 n. 11. The *Sleekcraft* factors instead constitute a non-exhaustive set useful signposts within the broader "likelihood of confusion" framework. *Id.*

In the context of the internet, three of the eight *Sleekcraft* factors have heightened import. As the Ninth Circuit has explained, "three most important *Sleekcraft* factors [in the internet context] are (1) the similarity of the marks, (2) the relatedness of the goods or services, and (3) the simultaneous use of the Web as a marketing channel." *GoTo.com. Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir.2000) (citation and internal quotation marks omitted). This so-called "controlling troika" of factors drives the court's internet-trademark analysis.

### A. Similarity of the Marks

Of the three parts of the "controlling troika," the "similarity of the marks" analysis has "always been considered [most] critical." *GoTo.com*, 202 F.3d at 1205 (citation omitted). When executing this "similarity of the marks" analysis, the court assesses the relevant marks as they appear in full in the marketplace, *see Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1147–50 (9th Cir.1999), judging similarity by reference to the marks' appearance, sound, and meaning, *Dreamwerks Prod. Group v. SKG Studio*, 142 F.3d 1127, 1131 (9th Cir. 1998). In this "similarity analysis," the "greater the similarity between the two marks at issue, the greater the likelihood of confusion"; the converse is likewise true. *GoTo.com*, 202 F.3d at 1206.

In "appearance, sound, and meaning," the "HALO"® and "blueHALO" marks share more than passing similarity. To begin, the two marks share a substantial visual affinity: The look of the "blueHALO" mark bears some similarity to HM's

---

16. As the Ninth Circuit has noted, this eight-pronged articulation of the test is, in some ways, unnecessarily elaborate, *Dr. Seuss*, 109 F.3d at 1404 n. 13. In related contexts, the Ninth Circuit has used five- and six-factor versions of a comparable framework. *See,*

*e.g., Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir.1987). However structured, the point of each version of the test is the same: to discern the likelihood of confusion that attaches to particular conduct.

unadorned and undistinguished "HALO" mark in that the font of the word "HALO" is in all capital letters, though the "blue" portion of the Interland mark is rendered in lowercase and in the color blue. In a like vein, the two marks share audiological and phonetic characteristics: The ring of the "blueHALO" mark echoes the sound of the "HALO" mark in significant part. And the meaning—in the specific trademark sense of the term "meaning"—of the "blueHALO" mark matches that of the "HALO" mark: Both are "arbitrary or fanciful in relation to the products on which they are used." *Virgin Enterprises, Ltd. v. Nawab,* 335 F.3d 141, 147 (2d Cir. 2003) (noting such marks, when registered, receive "broad, muscular protection"). These three prosaic measures thus confirm the initial similarity of the relevant marks. This similarity, in turn, supports HM's claim that a likelihood of confusion may exist in this instance. *Cf. Virgin Enterprises,* 335 F.3d at 149 (assessing uses of the word "virgin"); *see* Ashby Dec., Exhs. 6 & 8 (PTO decisions reaching the same conclusion).

B. *Relatedness of the Goods and Simultaneous Use / Marketing Channel*

▮ Both the second "controlling troika" factor (viz, whether particular goods are sufficiently related to confuse the public as to the producers of the goods) and the third "troika" element (viz, whether the goods are put to simultaneous use) appear to bolster this conclusion. *GoTo.com,* 202 F.3d at 1206–07. As a technological medium, the internet itself proves a "factor that courts have consistently recognized as exacerbating the likelihood of confusion." *Id.* at 1207 (citation and internal quotation marks omitted). Unlike other media, the internet permits simultaneous viewing of competing marks. And unlike other media, the internet can—and often does—channel users through electronic channels and in electronic directions not always anticipated or understood by those users. As a result, the Ninth Circuit has noted, "even services that are not identical are capable of confusing the public" in cyberspace. *Id.* It may be enough, in certain cyberspace contexts, to offer "remarkably similar" services or goods, if not identical ones. *Id.*

In this instance, HM's services are more than mildly analogous to those of Interland. Both entities operate internet service devices; both entities claim to provide, *inter alia,* web-hosting services for users; and both entities purport to solicit business simultaneously through the internet's ever-ready marketing channel. *See id.* (noting that the internet, as a marketing channel, is particularly likely to spur confusion). The affinity of service, timing, and means brings HM and Interland into competition for users and for marketing access, and it further confirms the similarity of the services simultaneously offered by HM and Interland.

C. *"Crowded Field"*

▮ The "controlling troika" of factors seems generally, if not firmly, to lean in HM's favor: The marks are similar; the goods are related; and the marketing channels are shared. This trio of conclusions would seem to support an initial inference of consumer confusion. The court must caution, though, that this initial inference of possible confusion is, in this instance, misleading. As explained above, the relevant trademark "field" is "crowded," a conclusion that cuts against HM's likelihood of confusion claim.

▮ Dozens of companies utilize some variant of the "halo" term, and many of these companies do so in the internet and computer context without distinguishing their marks from HM's. *Cf. PostX,* 80 F.Supp.2d at 1061. Because HM's mark is

both undistinguished in presentation [17] and "hemmed on all sides by similar marks on similar" goods, HM's "halo" mark is relatively weak as a matter of law. *Id.* And because MH's mark is "hemmed on all sides," confusion is more difficult to establish. As the Ninth Circuit recently observed, "that the marketplace is replete with products using a particular trademarked word indicates not only the difficulty in avoiding its use but also, and directly, the likelihood that consumers will *not* be confused by its use." *Entrepreneur Media*, 279 F.3d at 1144 (emphasis in original). To the extent the "controlling troika" demonstrates the similarity of the relevant marks, it militates *against*, not in favor of (as the "controlling troika" might otherwise suggest), HM's claim of confusion. *Id.; see also Sun Banks of Florida, Inc. v. Sun Federal Sav. and Loan Ass'n*, 651 F.2d 311, 317 (5th Cir.1981). Consumers confronted with marks ranging from "halosec.com" to "haloelectrics.com" to "bluehalo.com" will, as the Ninth Circuit has suggested, *"not* be confused" by use of the relevant trademarked term. *Id.*, The court thus finds that HM has not established a threshold likelihood of confusion.

## D. *Sleekcraft's Remaining Factors*

■ As Ninth Circuit doctrine makes clear, in internet-related actions like this, the "controlling troika" drives the court's preliminary injunction. *GoTo.com*, 202 F.3d at 1207. Still, because the parties discuss them, the court will address the remaining *Sleekcraft* factors. *See id.* (discussing the "remaining *Sleekcraft* factors only because the parties raise them"). These "remaining" factors include the

strength of HM's mark, the likelihood of expansion of that mark, the terms of Interland's intent, the magnitude of actual evidence of confusion adduced, and the relative sophistication of potential users. On balance, these factors bolster the court's foregoing likelihood-of-confusion analysis. *Id.*

As a threshold matter, the strength of HM's "HALO" mark is not substantial. Along the Ninth Circuit's "spectrum of increasing inherent distinctiveness," the "HALO" mark would seem to fall within the category of "arbitrary or fanciful" marks, i.e., the "strongest" of all mark categories. *Id.* at 1207. But, as noted, the relevant mark field is a particularly "crowded" one, proving HM's mark relatively and individually weak. While of limited importance in "the context of the Internet generally," *id.*, this "strength of mark" factor countervails HM's request for a preliminary injunction.

■ The same is not necessarily true of *Sleekcraft's* "likelihood of expansion" and "intent" factors. For one, Interland's aggressive promotion of the "blueHALO" appellation—with its attendant computer services—intimates a strong potential for expansion of Interland's "blueHALO"-related product lines. *Brookfield*, 174 F.3d at 1060 (suggesting that this factor is likewise "relatively unimportant"). For another, Interland's intent is inherently dubious, particularly since the company continues to employ and to promote the "blueHALO" mark after two PTO rejections of "blueHALO" registration applications. *GoTo.com*, 202 F.3d at 1208. Even if Interland's motive were closer to

---

**17.** The court pauses to note that HM's presentation of its "HALO" mark is a completely unadorned one, presenting a single, widely-used word in the barest conceivable manner. In so doing, HM has attempted to trademark a ubiquitous term in the broadest possible way and to place its mark in conflict with

nearly every "halo"-based mark in the relevant "field." But the kind of undistinguished, unadorned presentation HM adopts does more than call marks like Interland's into question; it seems to invite the confusion that attaches to the "HALO" mark, the confusion of which HM now complains.

pristine, in fact, there is no requirement that a party establish malicious intent in an effort to demonstrate a likelihood of confusion. *Id.*

In a like vein, there is no firm requirement that a party—at the preliminary injunction stage—adduce evidence of *actual,* rather than *potential,* confusion. *Id.* As Interland avers, HM has adduced nothing to demonstrate actual consumer confusion. At the preliminary injunction stage, the relevant question is *likelihood* of confusion (i.e., potential confusion), not *actual* confusion. *Id.* To compel a party to establish actual confusion at the preliminary injunction stage would blur the lines between distinct legal questions. Still, HM has adduced little to show potential confusion, either, particularly in this "crowded field" of marks.

And HM has adduced little to show that consumers are too unsophisticated to navigate this crowded field. As the Ninth Circuit has observed, to credit average web users with a particularly high level of sophistication would be to overestimate the acumen of the average web user. *Id.* Web users, the Ninth Circuit has noted, cannot be understood to be particularly—or even moderately—more sophisticated and careful consumers than any others. "Navigating amongst web sites involves practically no effort whatsoever," the Ninth Circuit has observed; "arguments that Web users exercise a great deal of care before clicking on hyperlinks are [thus] unconvincing." *GoTo.com,* 202 F.3d at 1209 (finding support in the Third Circuit's equation of a reasonably prudent purchaser with the least sophisticated consumer) (citing *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 293 (3d Cir.1991)). But, in this context, consumers are confronted with a surfeit of "halo"-based marks. Because so many such marks appear, it is not unreasonable to assume that those seeking a "halo"-related service will exercise an extra modicum of care, i.e., that "consumers will *not* be confused by [ ] use" of the "halo" mark, particularly where Interland's mark is notably distinct in appearance. *Entrepreneur Media,* 279 F.3d at 1144 (emphasis in original).

Taken together, this remaining handful of *Sleekcraft* factors confirms what the "controlling troika" suggests. There is no unmistakable likelihood of confusion in this instance, and HM has not demonstrated a likelihood of success on the merits of its Lanham Act claim. The court thus finds that HM has not "demonstrated the combination of success on the merits and the possibility of irreparable injury necessary to entitle it to a preliminary injunction in [this] trademark [action]." *Id.*

### III. *Serious Questions and the Balance of Hardships*

Because the court finds that HM has not adequately demonstrated the requisite combination of a likelihood of success on the merits and a possibility of irreparable injury to warrant equitable relief, the court must "decide whether there exist serious questions on the merits or whether the balance of hardships tips sharply in favor" of HM. *GoTo.com,* 202 F.3d at 1209. This second facet of the court's analysis also militates against HM's request for injunctive relief.

As a threshold matter, the court notes that this action seems to present serious questions of substantive law. HM raises initially colorable Lanham Act and California Business and Professional Code claims, claims that appear amenable to litigation on the merits. *Cf. Bernhardt v. Los Angeles County,* 339 F.3d 920, 926–927 (9th Cir.2003) (locating serious questions on the merits of a section 1988 claim); *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1362 (9th Cir.1988) (observing that serious questions are those that "can-

not be resolved one way or the other at the hearing on the injunction" and that such questions "need not promise a certainty of success, nor even present a probability of success"), *cert. denied,* 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989). But Interland has adduced significant evidence showing that HM has done very little, if anything to protect the value of its mark. To the extent HM has disregarded the value of its own mark, the court cannot conclude that the questions HM raises are, in the first instance, serious ones.

■■■ Nor can the court find that the balance of hardships tips heavily in HM's favor. On one side of the hardship scale, HM faces a relatively insubstantial burden, viz., the loss of weak trademark rights it has opted not to protect very seriously.[18] *Cf. Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough."). That is, HM faces the use by others of a trademark right that it has not maintained consistently and that it has not developed attentively. *Cf. El Pollo Loco, Inc. v. Hashim,* 316 F.3d 1032, 1038 (9th Cir.2003) (discussing the irreparable harm attendant to one's "continued unauthorized use" of another's trademark); *Stuhlbarg Intern. Sales Co. Inc. v. John D. Brush and Co., Inc.,* 240 F.3d 832, 841 (9th Cir. 2001) (discussing irreparable injury); *Tom Doherty Assocs., Inc. v. Saban Entrn't, Inc.,* 60 F.3d 27, 37–38 (2d Cir.1995) (locating irreparable harm in trademark licensing case where plaintiff lost the opportunity to expand its business). Interland's burden, by contrast, may prove significant. *Id.* Interland will lose use of and access to the "blueHALO" mark, and it will be forced to sacrifice the substantial business

expenditures related to developing that mark. To be sure, this loss might be a somewhat predictable one, for Interland's supposed loss must be viewed against the backdrop of the PTO's two-time denial of Interland's "halo"-related trademark applications. But the court cannot ignore the fact that the balance of hardships tips heavily in Interland's favor. HM has fallen short of making the showings required of a moving party in a trademark preliminary injunction action, and the court finds that the relief HM seeks is better left to a trial on the merits and, if successful, an appropriately tailored permanent injunction.

*CONCLUSION*

HM's motion for a preliminary injunction is DENIED.

IT IS SO ORDERED.

---

18. It may well be worth pursuing at trial precisely when the word "halo" was first used in any trademark or trade-name and when "halo" was first used in a trademark or trade-name in the computer or internet context.